In re Myron **LEVINE** and Jacquelyn Levine, Debtors.

James A. **MILLER,** Plaintiff,

v.

Myron **LEVINE** and Jacquelyn Levine, Defendants.

Bankruptcy No. 91–327–8P7.
Adv. No. 91–261.

United States Bankruptcy Court,
M.D. Florida,
Tampa Division.

March 16, 1994.

Bernard J. Morse, III, Tampa, FL, for plaintiff.

John A. Yanchunis, St. Petersburg, FL, for debtors/defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND MEMORANDUM OPINION

ALEXANDER L. PASKAY, Chief Judge.

THIS IS a Chapter 7 liquidation case and the matter under consideration is a challenge by James A. Miller (Miller) of the right to a general bankruptcy discharge of Myron Levine and his wife, Jacquelyn Levine (Debtors). The challenge is set forth in the Amended Complaint filed by Miller consisting of one count in which it is alleged that the Debtors within the twelve months immediately preceding the filing of their Chapter 7 petition converted, with the specific intent to defraud Miller and the Chapter 7 estate, their non-exempt assets into exempt annuities and their former residence into a residence in Florida which they claim exempt as their homestead pursuant to Art. X, § 4 of the Florida Constitution. Based on the foregoing, it is the contention of Miller that by virtue of § 727(a)(2)(A) the Debtors are not entitled to the benefit of the general bankruptcy discharge.

The facts relevant to the matter under consideration as established at the final evidentiary hearing are as follows:

While living in San Diego, Mr. Levine, either alone or with a partner, invested heavily in real estate. Sometime prior to 1986, he liquidated all of his real estate holdings. As part of these sales, the Debtor took back two mortgages, one in the principal amount of $60,000 which carried a 9.5% interest rate and called for monthly installment payments of $475.00, and the other in the principal amount of $130,000 which carried a 9.75% interest rate and called for monthly installment payments of $1,207.00.

Sometime in 1986, the Debtors entered into negotiations to sell their home in San Diego, California to Miller. The sale closed on December 31, 1986. After they sold their home in San Diego, the Debtors moved to Englewood, Colorado, and lived in Colorado for three years.

It appears that Miller, dissatisfied with the purchase of the San Diego home, sued the Debtors in December 1988 in a California state court seeking a rescission of the con-

tract and money damages based on fraud. The suit was initially set for trial on June 20, 1990 but was continued and was ultimately held on December 3, 4 and 5, 1990. It is without dispute that at the conclusion of the second day of the trial the presiding Judge announced that on the issue of liability he was ruling in favor of Miller and against the Debtors and he would consider and determine the damages to be assessed against the Debtors the next day. The trial was concluded on the third day at the end of which the Court announced that it would enter a money judgment for damages in favor of Miller and against the Debtors. On January 10, 1991, the Superior Court of the State of California, County of San Diego entered an Amended Judgment nunc pro tunc as of December 6, 1990 and awarded the sum of $265,894 with interest at the rate of 10% per annum from the date of judgment until paid, plus costs and disbursements, including $8,173 for Soils Engineering and Asbestos Removal Fees/Reports, and $6,451 in other costs, for a total cost sum of $14,624. Of course, during the pendency of this lawsuit, there were various and sundry motions and hearings and it is without dispute that the Debtors were fully aware of the progress of the lawsuit, including a motion filed by Miller in which he sought an order permitting discovery of the Debtors' financial condition; leave to file a second amended complaint; a preliminary injunction prohibiting transfer of any assets by the Debtors; and a motion to impose a constructive trust.

The Debtors negotiated to sell their Colorado home, ultimately sold it, and subsequently purchased their present home located in Sun City, Florida. The sale of the Sun City home was not closed until December 31, 1989. It appears that prior to these transactions, Mr. Levine was heavily involved in the stock market, primarily purchasing "penny stocks" and suffered substantial losses due to a decline in the market—$54,034 in the tax year 1988 (Defendants' Exhibit No. 2) and $97,227 in the tax year 1989 (Defendants' Exhibit No. 1) albeit this last number included a rollover of taxes from tax year 1988.

## CHARGES OF CONVERSION OF NON–EXEMPT ASSETS INTO EXEMPT ASSETS

The transfers which form the basis of Miller's complaint occurred in the following time sequence:

On January 6, 1990, or during the pendency of the suit filed by Miller, the Debtors contacted an investment advisor in Tampa in response to an advertisement in the local newspaper concerning possible investments in annuities. After discussing the matter, the Debtor purchased two annuity contracts, one from Jackson National Life Insurance Company and the other from Presidential Life Insurance Company. Both contracts were single premium contracts requiring payment of $75,000 each and provided an immediate payment of $1,485.93 and $2,965, respectively, per month for five years. The Debtor used the proceeds of the sale of the two notes he received when he sold his Colorado house to pay for these two annuities. The next purchase of non-exempt assets occurred in April 1990 when the Debtors purchased four annuity contracts totalling $170,000 from Life USA Insurance Company. Due to the severe losses suffered in the stock market, Mr. Levine's wife, Jacquelyn, insisted Mr. Levine liquidate his stock portfolio and place the funds in something more secure. While the losses were suffered in 1988 and 1989, the stocks were not sold and liquidated completely until mid 1990. This sale produced $105,000. On June 26, 1990, the Debtors purchased a paid up annuity in the amount of $90,000. The last purchase occurred sometime in August 1990 and the Debtors received an annuity in the face amount of $5,000.00 on September 4, 1990.

It is without dispute that in May or June the Debtors consulted an attorney in Florida ostensibly for the purpose of preparing their Last Will and Testament. The meeting with the Florida attorney took place during the pendency of the lawsuit in California, and close to the time when Miller filed his Motion in which he sought an order prohibiting the transfer of any assets by the Debtors, and when he attempted to discover their financial condition. It appears that during this conversation the Debtors discussed the exempt

status of annuities in Florida and they were advised by the attorney that the annuity contracts and homestead were in fact exempt from the claims of creditors in Florida. In addition, after Miller caused a writ of garnishment to be served on Mr. Levine's bank account in 1990, it appears that the Debtors contacted the law firm of Solomon & Poster in Tampa who advised the Debtors that in order to prevent any further seizure of assets they should file bankruptcy. Their voluntary petition was in fact filed on January 11, 1991, or after the entry of the amended final judgment on January 16, 1991 nunc pro tunc as of December 6.

In their Schedule of Liabilities filed together with their Petition, the Debtors scheduled only two creditors: Miller and the law firm of Toothaker & Pederson. That firm represented the Debtors in the California litigation, and the debt was apparently based on unpaid legal fees. In their Schedule C, the Debtors claimed as exempt $424,950 in annuities, $90,000 for their home in Sun City, and $1,750 for their household goods, furnishings and other personal property.

■ These are the salient facts on which Miller contends that, based on § 727(a)(2)(A), the Debtors are not entitled to the benefit of a general bankruptcy discharge. That section provides as follows:

§ 727 **Discharge**

(a) The court shall grant the debtor a discharge, unless—

(2) the debtor, with intent to hinder, delay, or defraud a creditor of an officer of the estate charged with custody of property under this title, has transferred

. . . . . .

(A) property of the debtor, within one year before the date of the filing of the petition

It is now well established that the burden of proof to establish a viable claim under this Section is on the plaintiff. It is also true that the standard of proof is no longer clear and convincing, but is the mere preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). To prevail under this Section it is clear that the plaintiff has the burden to establish that the debtor or the debtors transferred proper-

ty of the estate with the intent to hinder, delay or defraud creditors within one year of the commencement of the Chapter 7 case.

The initial difficulty in resolving § 727 claims in situations similar to the case *sub judice* is that, as a general proposition, a "transfer" presupposes a "transferror" and "transferee," and if both the transferror and transferee are the same, it appears conceptually difficult to accept the proposition that transfers in fact occurred. However, when one considers the net effect of the transfer in light of the extremely broad definition of that term as defined in § 101(58), such difficulty ceases to be problematic. The Code defines the term "transfer" as follows:

§ 101(58) **Transfer**

"transfer" means every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property, including retention of title as a security interest and foreclosure of the debtor's equity of redemption . . .

There is no question that Mr. Levine, by liquidating his non-exempt assets which would have been available to satisfy Miller's claim, and converting them into exempt assets, put said assets out of Miller's reach. Clearly the liquidations of non-exempt assets were in fact "transfers" within the meaning of the Code. This leaves for consideration whether or not they were the type of transfers contemplated by § 727(a)(2)(A), which, if established, would warrant the denial of discharge.

■ Absent extrinsic evidence of fraud, mere conversion of nonexempt property to exempt property is not fraudulent as to creditors. As noted in *Norwest Bank Nebraska, N.A. v. Tveten,* 848 F.2d 871 (8th Cir.1988), the debtors right to a discharge, unlike his right to the claimed exemptions, is determined by federal and not state law. For instance, the Fifth Circuit in *In re Reed,* 700 F.2d 986, 990 (5th Cir.1983); *3 Collier on Bankruptcy ¶ 522.08[4], at 36–37 (15th Ed. 1984),* held that it would constitute a perversion of the purposes of the Bankruptcy Code to permit a debtor earning $180,000 a year to convert every one of his major nonexempt assets into sheltered property on the eve of

bankruptcy in order to prevent his creditors from obtaining satisfaction, by converting assets which otherwise would be reachable but for the conversion, and then emerge, washed clean of future obligation by a carefully concocted baptism in bankruptcy waters.

In the present instance, there is no question that the Debtors had been engaged in extensive litigation with Miller in California since 1988. Between April and September 1990, the Debtors purchased most of their nonexempt assets. At that time, they were fully aware of the real possibility that they could suffer an adverse judgment in the California litigation. The suit was initially set for trial on June 20, 1990 and was reset and commenced on December 3, 1990. During 1990, there were numerous motions filed by Miller, most importantly, a motion for an injunction to prohibit the Debtors to transfer any properties and a motion to investigate their financial affairs. It is not clear whether both Debtors or only Mr. Levine contacted an investment advisor in Tampa on January 6, 1990, prior to the original trial date. It is without dispute, however, that both Debtors purchased annuity contracts thereafter, the last in August and received on September 4, 1990. Mr. Levine was fully aware of the danger of losing these nonexempt assets and it is not difficult to infer from the totality of the circumstances that these acquisitions were made for the primary purpose of putting these assets out of the reach of Miller and to prevent Miller from reaching these properties to satisfy his judgment.

When the Debtors' exemption claim was challenged initially, this Court ruled that based on prior case law and the legislative history of § 522, *H.R.Rep. No. 595, 95th Cong., 1st Sess. 361 (1977)* and *S.Rep. No. 989, 95th Cong., 2d Sess. 76 (1978)* that conversion of nonexempt assets into exempt assets is permissible and would not operate as a forfeiture of the Debtors' right to exemptions. *In re Levine,* 139 B.R. 551 (Bankr. M.D.Fla.1992). However, the Court also noted that in allowing the claimed exemptions the Court did not intend to indicate that "pre-bankruptcy planning" or the conversion of nonexempt assets into exempt assets may not be grounds to bar the debtor's discharge. *In re Tveten, supra. See also In re Johnson,* 880 F.2d 78, 82 (8th Cir.1989). It is not difficult to infer from the foregoing that the systematic conversion of non-exempt assets by Mr. Levine during the pendency of the action by Mr. Miller against the Debtors was for the specific purpose of immunizing the non-exempt assets and putting them out of the reach of Miller in the event he ultimately prevailed in his lawsuit. This Court is constrained to reject the contention of Mr. Levine that the reason the Debtors moved from San Diego to Colorado was because Mr. Levine suffered from Raynaud's Syndrome. This disease is manifested by intermittent blanching and reddening of the skin, particularly on the fingers and toes, brought about by exposure to the cold. One need not be an expert in meteorology to observe that the last place one wants to move with this disease is Colorado. Yet the Debtors lived there for three years before moving to Florida. The move to Florida was not made because of Florida's more moderate climate but because of the more hospitable environment of Florida to debtors with substantial assets which could be immunized under its liberal exemption laws.

In sum, based on the totality of the evidence, this Court is satisfied that Miller has established, with the requisite degree of proof, all operating elements of the basis to bar discharge under § 727(a)(2)(A) as to Myron Levine.

This leaves for consideration whether or not Miller also established his claim against Mrs. Levine. The record is insufficient to establish that she actively participated in these transactions or whether the annuities purchased were possibly placed in joint names. Therefore, the Plaintiff has not met his burden of proof as to Mrs. Levine and this court will not bar her discharge on this record.

A separate final judgment shall be entered in accordance with the foregoing.