In re James A. SEGAL, Stacie A. Segal, Debtors.

Chrisoula LAMBRAKIS, Paul Lambrakis, Plaintiffs,

v.

James A. SEGAL, Stacie A. Segal, Defendants.

Bankruptcy No. 97–31050.
Adversary No. 97–910.

United States Bankruptcy Court,
S.D. Florida.

June 2, 1998.

Harry Ross, Boca Raton, FL, for Lambrakis.

Daniel Mandel, Boca Raton, FL, for Debtors.

Mark L. Jacobson, Boca Raton, FL, for Trustee.

## OPINION

LARRY L. LESSEN, Bankruptcy Judge.

The issue before the Court is whether the Debtors' discharge should be denied pursuant to 11 U.S.C. § 727(a)(2) where the Debtors converted nonexempt property to exempt property with the intent to hinder, delay and defraud creditors.

The Debtors, James and Stacie Segal, purchased a business known as Dan's News from the Plaintiffs, Chrisoula and Paul Lambrakis, on November 7, 1994. The purchase price of $140,000 was to be paid through a $20,000 cash downpayment and a $120,000 note with sixty monthly installments of $2433.70. The Debtors signed the promissory note personally and on behalf of Dan's News, Inc., the corporation which they formed to purchase and operate Dan's News. To secure payment of the promissory note, the Debtors executed a security agreement, both personally and on behalf of Dan's News, Inc., wherein payment of the note was secured by both the business and assets of Dan's News, Inc.

The Debtors were inconsistent and slow to pay on their note to the Plaintiffs. They received frequent calls from the Plaintiffs inquiring about their payments. On January 7, 1996, the Debtors and Dan's News, Inc. entered into a new note with the Plaintiffs for the $106,625.67 owing to the Plaintiffs. The purpose of the new loan was to reduce the payments to the Plaintiffs. The new note provided for monthly payments of $1845.71 over 48 months with a balloon payment of $46,457.98 in the last (49th) month. The Debtors signed the new note personally and on behalf of Dan's News, Inc.

In February 1996, the Debtors were negotiating the sale of Dan's News. One of the prerequisites of any sale of Dan's News was the consent of the Plaintiffs to the sale. Mr. Segal requested such consent in a letter faxed to the Plaintiffs on February 11, 1996. In addition, Mr. Segal explained that the prospective purchasers did not want to deal with two liens on the business, and he requested that the Plaintiffs release their lien on Dan's News:

> I think that it may be sufficient if the only security agreement on the store is the one Stacie and I have with the new owners. For the aforementioned reason, it allows us to resume ownership/management if they default. Conversely, by giving up your security interest in the store, I don't think you are being put at greater risk. You still have our promissory note and personal guarantees to back up your loan

> to us, and one of our assets will be our mortgage on Dan's News and the personal guarantees of the buyers. Quite honestly, the only way we would default on our note would be because of nonpayment by our buyers, and if that happened, we'd be right back in there to ensure continuous operations and uninterrupted payments to you. Frankly, doing this would also greatly simplify the new sales contract by eliminating any tie-ins to you and our agreements.

Mrs. Lambrakis complied with these requests, and she executed a document on February 23, 1996, consenting to the sale of Dan's News and the termination of the security agreement. Paul Lambrakis did not consent to the sale or the termination of security agreement.

On March 20, 1996, the Debtors, as owners of Dan's News, Inc., sold the assets of Dan's News, Inc. to Sand and Sanf, Inc. for the purchase price of $166,500. They received $33,000 in cash and another $33,000 pursuant to a 120 day note. (Some of these proceeds went to pay vendors of Dan's News.) The balance was to be paid through a $100,000 note with monthly payment of $2400 beginning in April 1996.

Meanwhile, the Debtors were consistently late in their payments to the Plaintiffs. The Debtors explained to the Plaintiffs that Sand and Sanf, Inc. was late with their payments to them, thus causing the Debtors to be late with their payments to the Plaintiffs. This was not true; the Debtors always received their money on time from Sand and Sanf, Inc.

The Debtors received their monthly payments from Sand and Sanf, Inc. through August 1996. At this time, the balance of the note was discounted to Sand and Sanf, Inc. for $65,000. The funds were deposited into two accounts—$50,000 into Merrill Lynch and $15,000 into NationsBank in October when the discounted note was paid in full. The Debtors used part of these proceeds to catch up their payments to the Plaintiffs. However, they never advised the Plaintiffs that they had discounted the $100,000 note, or that the Debtors' mortgage on Dan's News, which Mr. Segal touted in his

letter of February 11, 1996, was no longer in existence.

On November 22, 1996, the Debtors purchased their home at 5255 Fearnley Road, Lake Worth, Florida, for $199,750. The Debtors used approximately $50,000 of the $65,000 received from the discount of the $100,000 note as their cash downpayment on their home. They borrowed another $149,800 to complete the purchase. The Debtors did not make any further payments to the Plaintiffs after they purchased their home.

The Debtors were low grade borrowers with fairly poor credit. Their mortgage application showed around $50,000 in consumer debt which the Debtors were not paying. The Debtors did not disclose their obligation to the Plaintiffs ($106,625.62 as of October 31, 1996) on the mortgage application. Their mortgage application would have been rejected if they had disclosed this debt.

The Debtors explained that they used the $50,000 from the discount of the note to purchase their homestead because they were waiting for Mr. Segal's father to close a real estate deal. It was expected that Mr. Segal's father would provide them with $50,000 from the proceeds of his real estate to help the Debtors with the purchase of their home. The Debtors stated that they needed to complete the purchase when they did or they would have lost the $10,000 earnest money which Mr. Segal's father previously advanced to them. The Debtors never told their mortgage broker that Mr. Segal's father was to provide them with $50,000. The real estate deal which Mr. Segal's father was counting on eventually fell through.

As a result of the Debtors' failure to make their November 1996 payment to the Plaintiffs, the Plaintiffs accelerated the note for full payment. The Plaintiffs filed suit on the note on December 30, 1996. The Debtors defaulted in answering the complaint.

On February 24, 1997, the Debtors signed their bankruptcy petition and schedules. Their bankruptcy petition was filed on March 6, 1997. The Debtors claimed their entire homestead to be exempt pursuant to Art. X, § 4 of the Florida Constitution. The Debtors did not disclose in their schedules that they had sold the assets of Dan's News or that they had discounted their $100,000 purchase money note for $65,000.

The Debtors' bankruptcy schedules were executed under penalty of perjury. The Debtors certified that the information provided in their bankruptcy schedules and petition was true and correct. As provided in 28 U.S.C. § 1746, such certification has the force and effect of an oath.

On June 12, 1997, which was after the § 341 meeting and the same day as the Debtors' Rule 2004 examination, the Debtors filed an Amendment to Question 10 of their Statement of Financial Affairs disclosing the sale of the assets of Dan's News, Inc. In addition, the Debtors also disclosed on June 12, 1997, that on or about October of 1996, Dan's News, Inc., discounted its purchase money note in the original amount of $100,000 and sold same for a discounted price of $65,000.

The Plaintiffs have filed an adversary complaint objecting to the discharge of the Debtors pursuant to 11 U.S.C. §§ 727(a)(2) and (a)(4). The Trustee has also filed a complaint objecting to the Debtors' discharge which makes the same allegations as those contained in the Lambrakis' complaint. Both adversaries were tried on March 27, 1998, and the matters were taken under advisement.

11 U.S.C. § 727(a)(2) provides as follows:

(a) The court shall grant the debtor a discharge, unless—

  * * * * * *

■■ (2) the debtor, with intent to hinder, delay or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed—

(A) property of the debtor, within on year of the filing of the petition.

The Plaintiffs have the burden of proving each element of this section by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). In order to prevail under this section, the Plaintiffs must prove that the Debt-

ors transferred property of the estate with the intent to hinder, delay or defraud creditors within one year of the commencement of the Chapter 7 case.

■ The first issue is whether the conversion of nonexempt assets into exempt assets constitutes a transfer. It is now well-settled that such a conversion does constitute a transfer. *In re Levine,* 134 F.3d 1046, 1049 (11th Cir.1998); *In re Levine,* 166 B.R. 967, 970 (Bankr.M.D.Fla.1994); *In re Davidson,* 164 B.R. 782, 785 (Bankr.S.D.Fla.1994). When the Debtors used $50,000 from the sale of Dan's News to purchase their homestead, they effectively put these funds out of the reach of creditors such as the Plaintiffs. This is a transfer within the meaning of 11 U.S.C. § 101(54).

The parties do not dispute that the disputed funds were property of the estate, and that the transfer occurred within one year of the filing of the bankruptcy petition.

■ The dispute in this proceeding is whether at the time of the transfer, the Debtors intended to hinder, delay or defraud a creditor or an officer of the estate. The mere conversion of nonexempt property to exempt property is not considered to be fraudulent as to creditors; there must be some extrinsic evidence of fraudulent intent. *In re Levine, supra,* 166 B.R. at 970; *In re Davidson, supra,* 164 B.R. at 785. However, it is not necessary that a debtor's conduct reach the level of fraud before the discharge can be denied under § 727(a)(2). *In re Smiley,* 864 F.2d 562, 566 (7th Cir.1989). The term "defraud" does not subsume "hinder or delay". *In re Bowyer,* 916 F.2d 1056, 1059 (5th Cir.1990). A discharge may be denied under § 727(a)(2) where there is a showing that at the time of the transfer the debtor intended to hinder or delay a creditor. *In re Davidson, supra,* 164 B.R. at 785.

■ Before discussing the evidence, the Court notes that it did not find the Debtors to be credible witnesses. Their lack of credibility was established by their demeanor, what they said, how they said it, and how their testimony related to the other evidence. Mrs. Segal's testimony was evasive and unilluminating. Mr. Segal was not a believable witness, and where his testimony conflicted with the testimony of other witnesses, the Court credited the testimony of other witnesses. In particular, the Court found William Lambrakis, the husband of Chrisoula and father of Paul, to be a very credible witness. He was honest, open and straightforward in his testimony.

It is clear that the Debtors were aware of their debt to the Plaintiffs during the entire year of 1996. Indeed, they received calls from the Plaintiffs or their agent on a regular basis throughout the year inquiring about the status of their payments to the Plaintiffs.

Beginning in early 1996, the Debtors engaged in a sharp practice of dealing with the intention of hindering and delaying the Plaintiffs. In January 1996, they persuaded the Plaintiffs to go along with them on a new note which would reduce their monthly payments. In February 1996, the Debtors coaxed the Plaintiff into releasing their security interest in Dan's News with the promise of their note, guaranty and mortgage on Dan's News. When the Debtors discounted the $100,000 note for a lump sum cash payment of $65,000 and released their security interest in Dan's News in the fall of 1996, they did not disclose this to the Plaintiffs even though they knew that it was important to the Plaintiffs. In fact, the Debtors had blamed their own spotty payment history with the Plaintiffs on slow payments from their buyers. It was only when the Plaintiffs checked with the buyers that they discovered that the note had been discounted.

The fact that the Debtors caught up their payments to the Plaintiffs with part of the proceeds from the discounted note does not show the Debtors' good faith. On the contrary, it merely shows that they intended to hold off the Plaintiffs until they could complete their scheme of converting the balance of the funds into exempt assets. The Debtors failure to make any payments to the Plaintiffs after they purchased their homestead demonstrates their true intent of removing the assets from the reach of creditors.

Because of their poor credit, the Debtors knew that the disclosure of their debt to the Plaintiffs on their mortgage application

would kill any chance of getting their mortgage and thus foil their plan to convert the proceeds of the discounted note into an exempt asset. Therefore, the Debtors omitted this debt from their mortgage application. When the mortgage went through, the Debtors purchased their homestead. This purchase allowed the Debtors to retain the benefit of the funds while keeping it out of the reach of the Plaintiffs.

Finally, the Debtors did not disclose the sale of Dan's News or the discount of the note in their original bankruptcy schedules. This attempt to hide their actions was eventually unsuccessful. While the Debtors did amend their schedules, they did not do so until two months after the Trustee learned of their actions and on the same day as their rescheduled 2004 examination.

In sum, based on the totality of the evidence, the Court finds that the Plaintiffs have established that the Debtors intended to hinder, delay and defraud their creditors when they converted the $50,000 in nonexempt cash into their exempt homestead. Therefore, the Debtors' discharge should be denied pursuant to 11 U.S.C. § 727(a)(2).

■ The Plaintiffs further argue that the Debtors' discharge should also be denied pursuant to 11 U.S.C. § 727(a)(4), which states that the Court should not grant a discharge to one who

> ... knowingly and fraudulently, in or in connection with the case—made a false oath or account.

There is no question that a false oath was made when the Debtors prepared their schedules. The question is whether it was done "knowingly and fraudulently". The facts in this case demonstrate that the Debtors have not been accurate or truthful with their creditors or with the Court. The omission of the sale of Dan's News and the discount of the note from their bankruptcy schedules is consistent with the Debtors' pattern of deliberate nondisclosure over the previous year. The Court simply does not believe the Debtors when they assert that the omission was unintentional. Therefore, the Debtors' discharge will be denied pursuant to

11 U.S.C. § 727(a)(4). *In re Collins,* 19 B.R. 874, 878 (Bankr.M.D.Fla.1982).

For the foregoing reasons, the discharge of the Debtors, James and Stacie Segal, is denied pursuant to 11 U.S.C. § 727(a)(2) and (a)(4).

This Opinion is to serve as Findings of Fact and Conclusions of Law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure.